UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

VALENTINE PROPERTIES ASSOCIATES, LP
and PARK PROPERTIES ASSOCIATES, LP,

                Plaintiffs,                05 Civ. 2033

   -against-                       OPINION

UNITED STATES DEPARTMENT OF HOUSING
AND URBAN DEVELOPMENT and ALPHONSO
JACKSON, in his capacity as Secretary
of the Unites States Department of
Housing and Urban Development.

                Defendants.



----------------------------------------X

A P P E A R A N C E S:


       Attorneys for Plaintiffs

       WELBY, BRADY & GREENBLATT, LLP
       11 Martine Avenue, 15th Floor
       White Plains, New York 10606
           By:  Alan David Singer, Esq.


       Attorneys for Defendants

       PREET BHARARA
       United States Attorney for the
       Southern District of New York
       86 Chambers Street, 3rd Floor
       New York, NY  10007
           By:  Mara E. Trager, Esq.

**Sweet, D.J.**

Plaintiffs Valentine Properties, LP ("Valentine") and Park Properties, LP ("Park"), collectively, the "Plaintiffs", filed a motion for summary judgment on April 29, 2010. Defendants United States Department of Housing and Urban Development ("HUD") and Alphonso Jackson ("Jackson"), collectively, the "Defendants," cross-filed for judgment on the pleadings on the same day. Oral argument was heard on October 13, 2010. For the reasons stated below, Plaintiffs' motion is denied and Defendants' motion is granted.

## I.  Statement of Facts and Prior Proceedings

Plaintiffs are the owners of two multi-family housing projects in Yonkers, New York, that receive project-based housing assistance payments from HUD, pursuant to Section 8 of the United States Housing Act of 1937, 42 U.S.C. § 1437 et seq. See Am. Cmplt. ¶¶ 1, 2, 13. Both plaintiffs entered into thirty-year term Housing Assistant Payment ("HAP") contracts with HUD in the late 1970's. Id. ¶ 13. Pursuant to the HAP contracts, Plaintiffs were required to maintain and operate their apartment units and related facilities so as to provide decent, safe, and sanitary housing. Id. ¶¶ 15, 35. The

contracts also have provided HUD with inspection rights to ensure compliance.  Id.

On June 30, 1998, HUD published a proposed rule to amend parts of Title 24 of the Code of Federal Regulations and establish uniform physical condition and inspection standards for certain HUD programs, including Section 8 project-based housing like the housing projects owned by Plaintiffs.  63 Fed. Reg. 35650 (Jun. 30, 1998).  The introductory summary to the proposed rule explained its purpose:

> HUD's Section 8 housing, Public Housing, HUD-insured
> multifamily housing, and other HUD assisted housing
> (collectively, HUD housing) currently must meet
> certain standards and must undergo an annual physical
> inspection to determine that the housing qualifies as
> decent, safe, sanitary, and in good repair.  The
> description or components of what constitutes
> acceptable physical housing quality and the physical
> inspection procedures by which the standards are
> determined to be met, however, vary from HUD program
> to HUD program.  To the extent possible, HUD believes
> that housing assessed under its programs should be
> subject to uniform physical standards, regardless of
> the source of the subsidy or assistance.
> Additionally, to the extent feasible, HUD believes
> that the physical inspection procedures by which the
> standards will be assessed should be uniform in the
> covered programs.  Therefore, this rule proposes that
> certain HUD housing, as defined in this rule, must
> meet uniform physical condition standards to ensure
> that the HUD housing is decent, safe, sanitary, and in
> good repair.  This rule also generally describes new
> physical inspection procedures that will allow HUD to
> determine conformity with such standards.  This rule
> would not change the requirement for annual physical

> inspections currently found in the covered HUD
> programs.

63 Fed. Reg. 35650.  The rule was apparently intended to unify,

to the extent feasible, the inspection standards and procedures

for various HUD programs.  Id.  These inspections were to be

conducted under the auspices of the newly-established "Real

Estate Assessment Center" ("REAC").  See 63 Fed. Reg. 46566,

46567 (Sept. 1, 1998).  After notice and comment, the final rule

was promulgated on September 1, 1998 (hereinafter the "1998

final rule").  Id.  Subsequently, on December 8, 2000, after

further notice and comment, HUD issued another rule setting

forth, among other things, the administrative process by which

HUD would notify owners of HUD's assessment of the physical

condition of their multifamily housing.  See 65 Fed. Reg. 77230

(Dec. 8, 2000) (hereinafter the "2000 final rule").  The

products of the 1998 and 2000 rulemaking procedures will be

collectively referred to as the "REAC Regulations."


In 2003, several years after the REAC Regulations took

effect, and after several annual inspections of Plaintiffs'

properties by HUD according to the REAC standards, Plaintiffs'

properties failed their annual inspection.  See Am. Cmplt. ¶¶

21-22.  HUD agreed not to terminate Plaintiffs' HAP contracts as

a result of these failing scores.  Id. ¶ 75.  Nevertheless,

Plaintiffs filed their initial complaint, dated February 5, 2005, asserting inter alia, that HUD's application of the REAC standards to Plaintiffs' properties and HUD's attempt to terminate Plaintiffs' HAP contracts based on the failed REAC inspections violated the terms of the HAP contracts.  See generally Complaint [Dkt. Entry No. 1].

HUD moved to dismiss the complaint on grounds of: (a) lack of subject matter jurisdiction because HUD had not waived its sovereign immunity from Plaintiffs' claims; (b) lack of standing because Plaintiffs' had suffered no concrete injury, and (c) the Court of Federal Claims' exclusive jurisdiction over Plaintiffs' breach of contract claims pursuant to the Tucker Act, 28 U.S.C. § 1491.  See Memorandum of Law in Support of Motion to Dismiss the Complaint, dated July 8, 2005 [Dkt. Entry No. 5], at 7- 19.  In the alternative, HUD also argued that the complaint should be dismissed for failure to state a claim because HUD had properly applied the REAC standards to Plaintiffs' properties.  Id. at 19-26.

The Court denied HUD's motion to dismiss for lack of jurisdiction.  See Oct. 12, 2007 Decision and Order [Dkt. Entry 12], at 8-11 ("2007 Order").  The Court determined that Plaintiffs could assert 28 U.S.C. § 1331 as an applicable basis

for jurisdiction.  See Id. at 11-14.  The Court permitted
Plaintiffs to amend the complaint to allege jurisdiction under §
1331, and then analyzed HUD's motion to dismiss under the
assumption that such an amendment would be made.  Id. at 14-31.
The Court granted part of HUD's motion with respect to its
argument that the complaint failed to state a claim.

Specifically, in light of HUD's agreement not to
terminate the HAP contracts on the basis of the already-
conducted failed REAC inspections, the Court dismissed
Plaintiffs' claim concerning these inspections of their
properties because they had not resulted in any concrete injury.
Id. at 21-23.  The Court also rejected Plaintiffs' contention
that HUD's regulations prohibit application of the REAC
inspection standards to Plaintiffs' properties, determining that
the REAC standards apply to all HAP contracts, regardless of
when the HAP contact was executed.  Id. at 24-25.  In addition,
the Court dismissed Plaintiffs' claim that HUD's adoption of the
REAC standards unlawfully amended the HAP contracts by changing
the definition of "decent, safe and sanitary."  Id. at 25-31.
Finally, the Court found that because HUD's motion papers had
not addressed certain of Plaintiffs' claims, those claims
survived the motion to dismiss.  Id. at 25.  Specifically,
Plaintiffs' surviving claims were that: 1) in light of the fact

5

that REAC's inspection standards are applied only to certain
types of Section 8 contracts, HUD's adoption of two different
definitions of decent, safe and sanitary depending on the type
of Section 8 contract involved is arbitrary and capricious; 2)
any attempt by HUD to apply REAC inspection standards to
terminate Plaintiffs' pre-1980 HAP contracts is barred and
illegal under HUD's own regulations; and 3) the REAC regulations
violate federal provisions, standards and preconditions to
adoption.  Id.

        As expected, following the Court's decision,
Plaintiffs filed an amended complaint, asserting 28 U.S.C. §
1331 as the basis of jurisdiction.  Am. Cmplt. ¶ 7.  Plaintiffs
also removed from their complaint the claims dismissed by the
Court in its 2007 Order but reasserted the claims that the Court
had found to survive the Government's motion to dismiss.


## II.  Applicable Standards


        The legal standard used to decide a motion for
judgment on the pleadings made pursuant to Rule 12(c) is
identical to the standard used to decide a motion to dismiss for
failure to state a claim pursuant to Rule 12(b)(6).  See, e.g.,
Patel v. Contemporary Classics of Beverly Hills, 259 F.3d 123,

6

126 (2d Cir. 2001) (collecting cases).  Therefore, to survive a
motion for judgment on the pleadings pursuant to Rule 12(c), "a
complaint must contain sufficient factual matter, accepted as
true, to 'state a claim to relief that is plausible on its
face.'"  Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting
Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Though
the court must accept the factual allegations of a complaint as
true, it is "not bound to accept as true a legal conclusion
couched as a factual allegation."  Iqbal, 129 S.Ct. at 1949
(quoting Twombly, 550 U.S. at 555).  Plaintiffs must allege
sufficient facts to "nudge [ ] their claims across the line from
conceivable to plausible."  Twombly, 550 U.S. at 570.


     Summary judgment "should be rendered if the pleadings,
the discovery and disclosure materials on file, and any
affidavits show that there is no genuine issue as to any
material fact and that the movant is entitled to judgment as a
matter of law."  Fed. R. Civ. P. 56(c).  In considering a
summary judgment motion, the Court must "view the evidence in
the light most favorable to the non-moving party and draw all
reasonable inference in its favor, and may grant summary
judgment only when no reasonable trier of fact could find in
favor of the nonmoving party."  Allen v. Coughlin, 64 F.3d 77,
79 (2d Cir. 1995) (internal citations and quotation marks

omitted); see also Matsushita Elec. Indus. Co. v. Zenith Radio
Corp., 475 U.S. 574, 587 (1986).


## III.   Defendants' Motion for Judgment on the Pleadings is Granted

### a.   HUD's Application of the REAC Inspection Standards to Its Section 8 Tenant-based Voucher Program is Neither Arbitrary Nor Capricious

Plaintiffs contend that HUD's application of REAC
standards[1] to the Section 8 project-based voucher program was
arbitrary and capricious and that HUD has selectively applied

---

[1] Plaintiffs contend in their motion papers that they challenge the
"REAC Protocol" and not the REAC Regulations.  However, Plaintiffs do
not clearly specify what constitutes the "REAC Protocol".  In their
first Rule 56.1 Statement, Plaintiffs allege that the REAC Protocol is
an action taken by HUD on December 8, 2000 establishing "a new
inspection code for the physical conditions of buildings."  Pl. Rule
56.1 Stmt., at ¶ 8.  However, in Plaintiffs' corrected Rule 56.1
Statement, they contend that the "REAC Protocol" is "new and
additional rules" promulgated by HUD "without notice and comment" for
"the physical conditions of buildings" to be implemented through REAC.
Pl. Corrected Rule 56.1 Stmt., at ¶ 1.  No part of the Federal
Register is cited.
    The "REAC Protocol" is not mentioned in the Amended
Complaint, and Plaintiffs' claims surrounding this alleged and
imprecisely defined "Protocol" appear to be raised for the first time
in their motion papers.  Furthermore, claims surrounding the "REAC
Protocol" are not among those which survived the 2007 Order dismissing
part of Plaintiffs' complaint and preserving limited other claims.
Plaintiffs' attempt to introduce the REAC Protocol into this case may
be seen as a tacit attempt to amend their pleadings, which the Court
rejects for undue delay, prejudice to Defendants, and, as will be
shown below, futility.
    Plaintiffs contend that the REAC Protocol is the REAC Code,
which they refer to in their Amended Complaint.  The Court's
assessment below functions under the assumption that this is the case.

the program in order to terminate certain projects.  Am. Cmplt. at ¶ 46.

The REAC Regulations were promulgated with proper notice and comment, meaning that they are eligible for deference from the courts.  Under Chevron, U.S.A., Inc. v. NRDC, 467 U.S. 837 (1984), the Court first considers whether "Congress has directly spoken to the precise question at issue."  467 U.S. at 842.  Where the Court finds that the statute is "silent or ambiguous with respect to the specific issue," the Court must proceed to the second step of the Chevron framework and determine whether the agency's interpretation is "based on a permissible construction of the statute."  Id. at 843.  Where Congress has "express[ly] delegat[ed]… authority to the agency to elucidate a specific provision of the statute by regulation," the resulting regulation must be "given controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute."  Id. at 843-44; accord United States v. Mead Corp., 533 U.S. 218, 226-27 (2001) ("[An agency interpretation] qualifies for Chevron deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority").  By contrast, where there is an implicit delegation

9

of authority - either because the statute is ambiguous or silent - the Court must uphold the agency's construction if it is reasonable.  See Chevron, 467 U.S. at 844.

Here, Congress delegated to HUD the responsibility for "issu[ing] rules and regulations establishing standards which provide for decent, safe, and sanitary living conditions in low-rent public housing projects."  42 U.S.C. § 1437l(j)(2) (1998); see also 42 U.S.C. § 3535(d) ("The Secretary ... may make such rules and regulations as may be necessary to carry out his functions, powers, and duties.").  HUD has acted pursuant to that authority while observing proper procedures.  Therefore, the REAC Regulations are entitled to Chevron deference and shall be reviewed for arbitrariness and capriciousness.

Plaintiffs claim that HUD's application of REAC Regulations to project-based housing and Housing Quality Standards ("HQS") Regulations to tenant-based housing evinces the arbitrary and capricious nature of the REAC Regulation's implementation.

At issue are two forms of section 8 housing: "tenant-based" and "project-based."  In tenant-based housing, an assisted family selects their home and their assistances travels

10

with them should they move.  24 C.F.R. § 982.1(b).  In project-based housing, rental assistance is provided to families who live in designated developments or units.  Id.

Also at issue are two forms of housing evaluation, REAC and HQS.  REAC testing focuses on the state of the entire project:

> The uniform standards in this proposed rule would set
> parameters under which the HUD housing must be
> maintained and will be evaluated.  These standards are
> designed to analyze, score, and rank the overall and
> general physical condition of a project.  This
> evaluation would not focus on a single element, but
> would take into consideration significant observable
> deficiencies and score compliance taken as a whole.  A
> single critical element with a major defect (for
> example, an inoperable heating system), however, could
> have a significant impact on a project's overall
> evaluation.  The proposed standards emphasize health
> and safety considerations as essential to housing that
> is decent, safe, sanitary and in good repair.

63 Fed. Reg. 35650, 35653.  The REAC inspection standards "address the major areas of HUD housing: the site; the building exterior; the building systems; the dwelling units; the common areas; and health and safety considerations."  See 63 Fed. Reg. 46566, 46577; see also 63 Fed. Reg. 46566, 46567; 63 Fed. Reg. 35650, 35653.  In fact, not every unit in a project is inspected; rather the inspector is to "inspect a randomly selected, statistically valid sample of the units in the project."  63 Fed. Reg. 46566, 46568.

11

HQS inspections, on the other hand, focus more on the individual units in which the assisted families live, while still giving some consideration to access to the unit, the building site, and the neighborhood.  See generally 24 C.F.R. § 982.401.  HQS inspections are also less nuanced.  There is no weighing of the relative importance of various aspects and functions of the housing; rather, the inspector is required to determine whether the unit meets all of certain specified "acceptability criteria."  See generally Id.

In its proposed rule setting forth the REAC inspection standards for notice and comment, HUD explained its decision to apply these standards to certain of its programs, such as project-based Section 8 housing, but not to its tenant-based voucher program:

> The housing quality standards (HQS) were originally
> established by the Secretary for the purpose of
> Section 8 tenant-based housing assistance.  Unlike
> Section 8 project-based assistance, HUD is
> continuously reviewing and approving new units into
> the Section 8 tenant-based assistance programs, and
> HUD has found that HQS is appropriate for this
> purpose.  As discussed earlier in this rule, HUD
> believes that all of its programs should be subject to
> the same uniform physical inspection requirements.
> HUD also believes that it would be appropriate to
> require the Section 8 Certificate and Voucher (tenant-
> based assistance) programs to be subject to the
> uniform standards.  However, HUD is not proposing at
> this time to apply the new uniform standards to such

12

housing, but instead will consider doing so at a later date.

63 Fed. Reg. 35650, 35652.  HUD further explained its decision

in response to public comments in its 2000 final rule:

> Several commenters objected that the rule does not
> apply to housing with tenants assisted by Section 8
> Certificates and Vouchers.  The commenters stated that
> this exemption undermines the uniformity position
> presented by HUD in the proposed rule.  The housing
> quality standards (HQS) in HUD's regulations were
> originally established by the Secretary for the
> purpose of Section 8 tenant-based housing assistance
> (the Rental Certificate and Rental Voucher programs).
> As HUD explained in the proposed rule, unlike Section
> 8 project-based assistance, HUD is continuously
> reviewing and approving new units into the Section 8
> tenant-based assistance programs, and HUD has found
> that HQS is appropriate for that purpose.  HUD will
> continue considering the application of the new
> uniform standards to housing with Section 8 tenant-
> based housing in the future, although it is not
> prepared to do so in this rule....

63 Fed. Reg. 46566, 46571.  In light of the above explanations,

HUD's decision to continue with HQS inspections in tenant-based

housing, at least temporarily, is not arbitrary or capricious,

but appears to be born of the unique continuous, apartment-

specific inspection demands of that program.  See generally

Chauffeur's Training School v. Spellings, 478 F.3d 117, 130 (2d

Cir. 2007) ("Ordinarily, agency decisions are not found to be

arbitrary and capricious unless the agency has relied on factors

which Congress has not intended it to consider, entirely failed

to consider an important aspect of the problem, offered

13

an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.")(internal citations and quotations omitted).

In their opposition papers, Plaintiffs claim at the REAC Protocol was not promulgated through proper notice and comment procedures and is not entitled to Chevron deference. The lack of specificity with which the REAC Protocol is described makes it impossible for the Court to independently assess whether this is the case.  However, even if the Court takes Plaintiffs at their word, the REAC Protocol is entitled to deference.

Without notice and comment formality, the REAC Protocol may be subject to deference under the sliding scale provided by Skidmore v. Swift & Co., 323 U.S. 134 (1944).[2]  See Mead, 533 U.S. at 228.  According to Skidmore, "The weight

---

[2] The ambiguity surrounding what the REAC Protocol consists of, and whether it merits Chevron or Skidmore deference, is not problematic because it withstands scrutiny under either standard.  See generally Doe v. Leavitt, 552 F.3d 75, 80 (1st Cir. 2009) (deeming it unnecessary to decide whether informal adjudication pursuant to express congressional delegation warrants Chevron or Skidmore deference because agency interpretation "withstands scrutiny" under either standard).  Based on Plaintiffs' representations, we assess the Protocol under the Skidmore standard.

[accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." 323 U.S. at 140. See also Sai Kwan Wong v. Doar, 571 F.3d 247, 259-60 (2d Cir. 2009) ("Under Skidmore v. Swift & Co., we give the agency's interpretation… respect according to its persuasiveness, as evidenced by the thoroughness evident in the agency's consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.") (internal quotations and citations omitted). Here, as noted above, Congress has delegated authority for evaluating section 8 housing to HUD, an authority HUD acted under in promulgating the REAC Protocol. Based on the explanations issued by HUD for the underlying regulations, HUD appears to have thoroughly considered the appropriate inspection standards for section 8 housing and the distinct needs of the tenant-based and project-based programs. HUD's reasoning is forceful and well-supported, and the REAC Protocol deals with an area of HUD expertise. Plaintiffs point out that the new standards stray from historical practice by creating a new regime. However, they do so under a set of properly promulgated regulations to meet the demands of the

15

project-based regime.  While Plaintiffs' lack of specificity in

their pleadings and motion papers make it impossible for the

Court to ascertain whether the REAC Protocol carries the force

of law and Chevron deference, HUD's reasoning in establishing

the REAC Protocol is persuasive.

Plaintiffs contend that the REAC Regulations, and the

REAC Protocol under those regulations, establish two definitions

for the terms "decent, safe, and sanitary," and are thus

arbitrary and capricious.  However, the REAC Regulations merely

establish two sets of inspection criteria for use in different

circumstances.  They do not define the same term in two

different ways.

To the extent that Plaintiffs argue that Congress

intended HUD to apply the same inspection standards to project-

based and tenant-based housing, the relevant statutory language

demonstrates otherwise.  With respect to project-based housing,

the relevant statutory language authorized HUD to "issue rules

and regulations establishing standards which provide for decent,

safe, and sanitary living conditions in low-rent public housing

projects."  42 U.S.C. § 1437l(j)(2).  With respect to tenant-

based housing, the relevant statutory language states that units

should be inspected "to determine whether the dwelling unit

16

meets the housing quality standards under subparagraph (B)."  42
U.S.C. § 1437f(o)(8)(A).  Subparagraph (B), in turn, gives
discretion to HUD to establish standards that are safe and
habitable.  42 U.S.C. § 1437f(o)(8)(B).  There is no indication
in the respective statutory language relevant to the two types
of housing that Congress intended that HUD apply one inspection
standard to all low income housing programs that it administers.


       Plaintiffs also argue that the terms "decent, safe,
and sanitary" are defined by two federal statutes as being the
equivalent of local and state building codes, and that HUD
standards are contrary to those federal statutes to the extent
that they provide more stringent requirements.  Pl. Mem. in Opp.
at 5-6, citing 42 U.S.C. § 4601(10); 12 U.S.C. § 1701z-11(d)(2).
Upon review of the statutes upon which Plaintiffs rely, it is
clear that neither of them actually defines the terms "decent,
safe, and sanitary."  In both statutes, the term is used to help
define other terms, but it is not defined itself.  See 42 U.S.C.
§ 4601(10), 12 U.S.C. § 1701z-11(d)(2).  Furthermore, nothing in
these cited provisions indicates that "decent, safe, and
sanitary" means in compliance with state and local codes.  42
U.S.C. § 4601(10) does not mention state and local codes, while
12 U.S.C. § 1701z-11(d)(2) states that projects must be
maintained in a "decent, safe, and sanitary condition and in

                              17

compliance with any standards under applicable State or local laws, rules, ordinances, or regulations… and any such standards established by the Secretary."  This statutory construction indicates that "decent, safe, and sanitary" is a distinct requirement that must be satisfied separately from state and local standards.  The provisions are complimentary.

### b. HUD Did Not Violate Its Own Regulations in Applying REAC Regulations to Plaintiffs' Properties

Plaintiffs' claim that "HUD's attempt to apply REAC to terminate Plaintiff's pre-1980 HAP Contracts is Barred and Illegal under HUD's own Regulations," citing 24 C.F.R. §§ 800.104(a) and 801.104(a).[3]  Am. Cmplt. at ¶¶ 12-13.  The basis for this contention is that Plaintiffs' projects received notices of selection prior to February 20, 1980.  However, Plaintiffs' citation of 24 C.F.R. §§ 880.104(a) and 881.104(a) is unavailing, as those provisions apply to HAP proposals pending on November 5, 1979 and February 20, 1980, respectively. Plaintiffs' HAP contracts had already been executed by those dates, bringing them under 24 C.F.R. §§ 880.104(b), (d) and 881.104(b), (d).  See Am. Cmplt. at ¶ 13.

---

[3] The complaint cites to the Code of Federal Regulations' Title 24, §§ 800.104(a) and 801.104(a) in support of this claim, but those provisions do not exist.  The Court assumes that Plaintiffs intended to rely on 24 C.F.R. §§ 880.104(a) and 881.104(a).

The Court's 2007 Order, while not addressing §§ 800.104(a) and 801.104(a), held that 24 C.F.R. §§ 880.104(b), (d) and 881.104(b), (d) apply the REAC inspection standards to all projects, regardless of when the Housing Assistance Payment ("HAP") contract was executed.  See 2007 Order at 24. Specifically, the Court determined that while subparts E and F of part 880 and 881 do not apply to contracts entered prior to November 5, 1979 and February 20, 1980, respectively (unless the owners chose that they should apply), see 24 C.F.R. § 880.104 (b), 881.104 (b), the REAC inspection standards, which are contained in 24 C.F.R. part 5, apply to all projects, regardless of when the contract was signed.  2007 Order at 24. "Notwithstanding the provisions of paragraph (b) of this section [24 C.F.R. § 880.104(b), 881.104(b)], the provisions of 24 C.F.R. part 5 apply to all projects, regardless of when an Agreement [to enter into a HAP contract] was executed."  24 C.F.R. §§ 880.104(d), 881.104(d); see also 24 C.F.R. part 5, subpart G (containing REAC inspection standards).

**c. Plaintiffs' Claims under Executive Orders 12866 and 13132 Fail as Those Orders Do Not Create a Private Right of Action**

Plaintiffs claim that HUD violated Executive Orders 12866 and 13132 by "misrepresent[ing] that the regulations… would not be economically significant" and by "falsely represent[ing] that REAC does not [preempt state law]."  Am. Cmplt. at ¶¶ 51, 53.

Executive Order 13132, 64 Fed. Reg. 43255 (Aug. 4, 1999), was not issued until August 1999, and was not in effect at the time that the 1998 final rule that established the REAC inspection standards (see 63 Fed. Reg. 46566, dated September 1, 1998) was published.  Thus, the 1998 final rule was not required to contain, and does not contain, any certification of compliance with this executive order.  On the other hand, the 2000 final rule establishing the REAC notification procedures did contain a certification pursuant to Executive Order 13132. In the 2000 final rule, the Secretary certified that, pursuant to the provisions of Executive Order 13132, the rule would not have federalism implications.  See 65 Fed. Reg. at 77240. Plaintiffs appear to acknowledge as much, claiming that the REAC inspection standards (contained in the 1998 final rule) preempt state law, but not claiming that the notification procedures (contained in the 2000 final rule) preempt state law.  See Am. Cmplt. at ¶ 54 (contending that the regulations "preempt State Law by substituting REAC for state and local Building Codes").

20

Regardless, both executive orders, by their own terms, are intended to "improve the internal management of the executive branch" and not to permit judicial review of an agency's compliance with their provisions. Section 11 of Executive Order 13132, provides:

> Judicial Review.  This order is intended only to improve the internal management of the executive branch, and is not intended to create any right or benefit, substantive or procedural, enforceable at law by a party against the United States, its agencies, its officers, or any person.

64 Fed. Reg. 43255.  Similarly, § 10 of Executive Order 12866, also precludes judicial review:

> Judicial Review.  Nothing in this Executive order shall affect any otherwise available judicial review of agency action.  This Executive order is intended only to improve the internal management of the Federal Government and does not create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its agencies or instrumentalities, its officers or employees, or any other person.

58 Fed. Reg. 51735 (Sept. 30, 1993).

"Executive Order 12,866, by its plain terms, precludes judicial review of an agency's compliance with its directive." Teledyne, Inc. v. United States, 50 Fed. Cl. 155, 190 (Fed. Cl. 2001).  Other courts considering similar provisions in other

21

executive orders have also found that no judicial review of

agency compliance with their provisions was available.  See

generally Air Transport Ass'n of America V. Federal Aviation

Admin., 169 F.3d 1, 8-9 (D.C. Cir. 1999) (finding in case where

an executive order provided that it was "intended only to

improve the internal management of the executive branch and does

not create any right ... enforceable against the United States"

that judicial review of an agency's compliance with the order

was not available); Calef v. Barnhart, 309 F. Supp. 2d 425, 433

(E.D.N.Y. 2004) (same) (citing Zhang v. Slattery, 55 F.3d 732,

747 (2d Cir. 1995)).  With no private right of action or

judicial review of HUD's compliance with these executive orders

available, Plaintiffs' claim is dismissed.


### d.  Plaintiffs' Claim under the Regulatory Flexibility Act is Dismissed as Untimely

Plaintiffs claim that HUD violated the Regulatory

Flexibility Act ("RFA") by misrepresenting that the REAC

inspection standards would not "have a significant impact on a

substantial number of small entities."  See Am. Cmplt. at ¶ 51.

The RFA requires federal agencies to prepare a "regulatory

flexibility analysis" in the course of their rule-making

processes unless "the head of the agency certifies that the rule

will not, if promulgated, have a significant economic impact on

22

a substantial number of small entities."  See 5 U.S.C. §§ 603,

604, 605(b).  If the agency head makes such a certification,

"the agency shall publish such certification in the Federal

Register ... along with a statement providing the factual basis

for such certification. ..."  5 U.S.C. § 605(b).

Plaintiffs' challenge to the certification is time-

barred.  The RFA provides that "a small entity that is adversely

affected or aggrieved by a final agency action is entitled to

judicial review of agency compliance with [section 605(b)]."  5

U.S.C. § 611(a)(1).  However, such review may be sought only

"during the period beginning on the date of final agency action

and ending one year later," unless a different provision of law

specifies a shorter period.  5 U.S.C. § 611(a)(3)(A).  Here,

Plaintiffs did not file this lawsuit until 2005, more than one

year from September 1, 1998, the date the final rule setting

forth the inspection standards became final.  See 63 Fed. Reg.

45655.  Plaintiffs also did not file within one year from

December 8, 2000, the date that the later rule setting forth the

notification procedures became final.  See 65 Fed. Reg. 77230.

**e.  Plaintiff's Claim Derived from the Unfunded Mandates
Reform Act is Untimely and Fails to State a Claim**

23

Plaintiffs allege that HUD violated Title II of the Unfunded Mandates Reform Act of 1995 (the "UMRA") by "misrepresent[ing] that the regulations ... would not impose and [sic] federal mandates on the private sector." Am. Cmplt. at ¶ 51.

The stated purpose of UMRA is "to end the imposition, in the absence of full consideration by Congress, of Federal mandates on State, local and tribal governments without adequate Federal funding, in a manner that may displace other essential State, local and tribal governmental priorities." 2 U.S.C. § 1501. Title II of UMRA requires an agency promulgating a rule that constitutes a "federal mandate" to prepare a written statement evaluating the action. 2 U.S.C. § 1532. UMRA defines "federal mandate" as those regulatory or statutory provisions that impose "an enforceable duty upon the private sector except- … a duty arising from participation in a voluntary Federal program." 2 U.S.C. §§ 658(6), 658(7)(A)(ii). Because participation by private entities that own or manage HUD housing is voluntary, HUD correctly determined that the REAC regulations did not impose a federal mandate within the meaning of the UMRA. See 63 Fed. Reg. 46566, 46572, 46576; 65 Fed. Reg. 77230, 77239-40.

24

Even if the REAC rule-making imposed a "federal mandate" within the meaning UMRA, it would not entitle Plaintiffs to the relief that they seek.  See generally Am. Cmplt. at ¶ 56.  Pursuant to the terms of the UMRA, if an agency does not comply with an obligation under § 1532 to prepare a statement, the appropriate relief is for the court to "compel the agency to prepare such written statement."  2 U.S.C. § 1571(a)(2)(B).  The statute expressly provides that "[t]he inadequacy or failure to prepare such statement... shall not be used as a basis for staying, enjoining, invalidating or otherwise affecting such agency rule."  2 U.S.C. § 1571(a)(3); see Allied Local and Reg 'l Mfrs. Caucus v. U.S. E.P.A., 215 F.3d 61, 81 n. 22 (D.C. Cir. 2000); Associated Builders & Contractors, Inc. v. Herman, 976 F. Supp. 1, 15 (D.D.C. 1997); see also 2 U.S.C. § 1571(b) ("Except as provided in [§ 1571(a)]… any estimate, analysis, statement, description, or report prepared under this Act, and any compliance or noncompliance with the provisions of this chapter, and any determination concerning the applicability of the provisions of this Act shall not be subject to judicial review; and… no provision of this chapter shall be construed to create any right or benefit, substantive or procedural, enforceable by any person in any administrative or judicial action.").

25

Furthermore, by the terms of the statute, any petition to compel compliance must be made within 180 days of the promulgation of a final rule.  2 U.S.C. § 1571(a)(5). Plaintiffs' lawsuit was not brought within 180 days of the issuance of the final rules setting forth the inspection standards at issue in this case, making any challenge to the agency's compliance or non-compliance with the requirements of UMRA is untimely.[4]

Plaintiffs contend that Defendants waived their failure to state a claim arguments regarding the Executive Order and UMRA claims by virtue of Defendants not presenting them in their prior Rule 12(b)(6) motion.  However, it is permissible for Defendants to first raise such claims on a Rule 12(c) motion for judgment on the pleadings, as they have here.  See Fed. R. Civ. P. 12(h)(2)(B).  See also Gindi v. Silvershein, Nos. 93 Civ. 8679, 93 Civ. 8680, 1995 WL 347397, at *6 n. 1 (S.D.N.Y.

---

[4] Plaintiffs argue that Defendants waived their timeliness arguments with regard to the RFA and UMRA claims.  However, Defendants' plain assertion that "several of plaintiffs' claims are barred by the applicable statutes of limitations" in their answer was sufficient to preserve this defense.  See Santos v. Dist. Council of New York City, 619 F.2d 963, 967 (2d Cir. 1980) ("[U]nder Fed. R. Civ. P. 8(c), the statute of limitations constitutes an affirmative defense, to be asserted in a responsive pleading.  The defense is sufficiently raised for purposes of Rule 8 by its bare assertion.  Identification of the particular statue relied upon, though helpful, is not required in the pleading.") (footnote omitted).

Jun. 8, 1995); CSFB Holt LLC v. Collins Stewart Ltd., No. 02
Civ. 3069, 2004 WL 1794499, at *8 (S.D.N.Y. Aug. 10, 2004)
(citing Santos, 619 F.2d at 967 n. 4).


### f.  Plaintiffs' Attempts to Resurrect Dismissed Claims on Grounds of HUD Deception are Rejected

Plaintiffs seek to re-litigate their claims that HUD's
adoption of the REAC Regulations and REAC Protocol was
deceptive, inconsistent with prior law, and violated the Fifth
Amendment's Due Process clause.  These claims were properly
dismissed in 2007, and the Court does not see adequate grounds
for their resurrection.


Preliminarily, a brief opposing a dispositive motion
is not the appropriate means of seeking to revive previously
dismissed claims. See generally Aventis Environmental Science
USA LP v. Scotts Co., 383 F. Supp. 2d 488, 512 (S.D.N.Y. 2005)
("A request in an opposition brief to a motion for summary
judgment marshaling new facts is an improper means for
requesting reinstatement of a previously dismissed claim, and I
decline in entertain such a request.").


Plaintiffs contend that HUD "deceived the Court" into
issuing its ruling that HUD had the authority to change the

definition of "decent, safe and sanitary." See Pl. Mem. in Opp.
at 4-5. However, Plaintiffs do not point to any statutory or
other provision which suggests that HUD lacks the authority to
change inspection standards governing Section 8 project-based
housing. Plaintiffs argue that "the Minimum Property Standards
are prospective only and apply to new or rehabilitated
construction, not to existing buildings" and cite to Docket No.
FR-4280-F-03 (August 27, 1998), which is the 1998 Final Rule.
Pl. Opp. Br. at 5. Even if this construction of the 1988 Final
Rule was plausible, it does not support Plaintiffs' allegations
that HUD deceived the Court or had no authority to change
inspection standards.

Plaintiffs also cite to 42 U.S.C. § 1437l(j)(2) in
supposed support of their assertions that HUD deceived the Court
and that HUD does not have the right to change housing
standards. That provision provides:

> (2) The Secretary shall issue rules and regulations
> establishing standards which provide for decent, safe,
> and sanitary living conditions in low-rent public
> housing projects and for energy conserving
> improvements in such projects and which, to the extent
> practicable, are consistent with the Minimum Property
> Standards for Multi-Family Housing as they reasonably
> would be applied to existing housing, except that the
> Secretary may establish higher standards on a project-
> by-project basis in such cases where the Secretary
> deems such higher standards appropriate for furthering
> the purposes of this section.

28

42 U.S.C. § 1437l(j)(2) (1998). Plaintiffs contend that this provision supports their assertion that HUD is permitted to change inspection standards for modernized but not existing housing. Pl. Mem. in Opp. at 5. However, this provision, which has since been repealed, appears to require that the standards for both existing and modernization of housing be consistent. Moreover, Plaintiffs' assertion that 42 U.S.C. § 1437l(j)(1) limits the Secretary's discretion under 42 U.S.C. § 1437l(j)(2) is not supported by the text. See Pl. Mem. in Opp. at 5. Rather, 42 U.S.C. § 1437l(j)(1) empowers the Secretary to "issue such rules and regulations as may be necessary to carry out the provisions and purposes of this section."

Plaintiffs have not shown a basis for revisiting other aspects of the 2007 Order. Plaintiffs urge the Court to reinstate their claims "relating to REAC's abrogation of the HAP contracts," including their Fifth Amendment Due Process claim, because HUD "misled" the Court by claiming that the "REAC Protocol" is nothing like the REAC Regulations, that "REAC was merely a new scoring system, creating new significant new [sic] obligations and inspected the same areas as the previous HQS inspections." Pl. Mem. in Opp. at 13. Plaintiffs do not point to any specific statements by HUD, and the Defendants' positions they take issue with appear to be valid differences of opinion.

29

Regardless, the Court's decision did not rest on the ground that the REAC inspection standards were substantially the same as the ones previously in effect. Instead, the Court determined that REAC did not unlawfully amend Plaintiffs' HAP contracts on the basis that HUD had discretion to change the inspection standards. See 2007 Order at 26-31.

## IV. Plaintiffs' Additional Claims Regarding the "REAC Protocol" are Dismissed

In their motion for summary judgment, Plaintiffs allege that the "REAC Protocol" is invalid because it represents the adoption of two definitions for the terms "decent, safe, and sanitary"[5]; is arbitrary and capricious because it does not follow the REAC Regulations; was adopted in bad faith and is irrational and unsupported by substantial evidence; and violates the Tenth Amendment and the statute claimed to authorize it. All of these claims fail.

Preliminarily, with the exception of the claim alleging two definitions of "decent, safe, and sanitary", these claims do not appear to stem from the Amended Complaint, but are being raised for the first time in Plaintiffs' motion papers.

_____

[5] This argument is addressed in section III.a., supra.

This is impermissible.  See generally RST (2005) Inc. v.
Research in Motion Ltd., No. 07 Civ. 3737, 2008 WL 5416379, at
*9 (S.D.N.Y. Dec. 17, 2008) (refusing to permit defendant "to
effectively amend its pleadings" where "the bulk of the grounds
that [defendant relied] on in its summary judgment motion were
not articulated, or even hinted at, in its counterclaim");
Gamble v. Chertoff, No. 04 Civ. 9410, 2006 WL 3794290, at *4
(S.D.N.Y. Dec. 27, 2006) (dismissing discrimination claim in
part on ground that plaintiff had not pleaded the claim in her
complaint but had only raised it in opposition to the
defendant's summary judgment motion) (citing Martinez v. City of
New York, No. 00 Civ. 7914, 2003 WL 2006619, at *4 (S.D.N.Y.
Apr. 30, 2003); Beckman v. U.S. Postal Serv., 79 F. Supp. 2d
394, 407-08 (S.D.N.Y. 2000).  Furthermore, these claims were not
among those the Court considered alive after Defendants' last
motion to dismiss.  Plaintiffs are not permitted to raise these
claims here, to the extent they are new, given their undue delay
in bringing them, the prejudice to Defendants, and the futility
of their contentions.  See generally Sanders v. Grenaldier
Realty, Inc., 367 Fed. Appx. 173, 176 (2d Cir. 2010) ("A
district court has discretion to deny leave [to amend] for good
reason, including futility, bad faith, undue delay, or undue
prejudice to the opposing party.") (internal citation and

31

quotations omitted).  Apart from this procedural shortcoming,

Plaintiffs' new claims fail on the merits.


### a.  The REAC Inspection Standards Do Not Preempt State and Local Codes

By their own terms, the REAC Regulations do not pre-

empt state and local codes.  They provide:

> Compliance with State and local codes. The physical
> condition standards in this section do not supersede
> or preempt State and local codes for building and
> maintenance with which HUD housing must comply. HUD
> housing must continue to adhere to these codes.

24 C.F.R. § 5.703(g).  Under the REAC, properties must comply

with both REAC standards and state and local standards.  The

sets of standards are complementary, and the possibility that

the REAC standards may be more demanding in certain areas does

not mean that they preempt state and local codes.


Plaintiffs' argument that the REAC regulations

supplant state and local codes appears to rely on two letters

from HUD to Plaintiffs.  Plaintiffs contend that, in these

letters, HUD "admitted ... that REAC does supplant local codes."

Pl. Mem. in Supp. at 21.  Plaintiffs, however, cite only one

line from these letters: "there may be instances in which the

REAC inspection protocol conflicts with state, local and fire

safety codes."  See Id.  The following line in each of the

letters, however, provides: "In those instances, the owner may request a database adjustment that may restore points deducted for conditions that comply with local codes." Def. Mem. in Opp. Appx. A at 3, 6. In addition, both letters state: "Similarly, an owner may make a properly documented request for a database adjustment when points have been deducted for conditions which pre-date the Uniform Physical Condition Standards but which comply with applicable local or state codes." Id. These letters indicate that HUD attempted to avoid conflict with state and local codes by allowing adjustments to REAC scoring in circumstances where the REAC inspection standards arguably conflicted with state or local codes. It is further support for the complimentary characterization of the two inspection regimes.

### b. The REAC Regulations Do Not Forbid Default of Low-Scoring Properties

Plaintiffs contend that "nothing in the proposed regulations... as adopted allowed for default or termination of a HAP contract based on single inspection score of below 60." Pl. Mem. in Supp. at 6, 8. However, the REAC Regulations afford HUD substantial discretion with respect to when a property may be referred to the HUD's Departmental Enforcement Center for enforcement. Properties scoring less than 30 points are

referred as a matter of course, but the Regulations also provide

discretion to refer other properties for enforcement as well:

> Administrative review of properties.  The file of a
> multifamily property that receives a score of 30
> points or less on its physical condition inspection
> will be referred to HUD's Departmental Enforcement
> Center (DEC) for evaluation.  The files of any of the
> multifamily housing properties may be submitted to the
> DEC or to the appropriate HUD Multifamily Hub Director
> (MFD) for evaluation, or both, at the discretion of
> the Office of Housing.

24 C.F.R. § 200.857(h); see also 65 Fed. Reg. 77243 (same).

Moreover, contrary to Plaintiffs' argument that the regulations

preclude HUD from declaring a default if properties do not

comport with the inspection standards, the regulations provide

authority to take enforcement action:

> (3) Non-cooperation and Non-compliance by owner.  If
> at the conclusion of the 30th calendar day following
> submission of the DEC Compliance Plan to the owner,
> the DEC receives no response from the owner, or the
> owner refuses to accept the DEC Compliance Plan, or to
> present a counter compliance plan proposal, or if the
> owner accepts the DEC Compliance Plan or revised DEC
> Compliance Plan, but refuses to take the actions
> required of the owner in the plan, the DEC may take
> appropriate enforcement action.
>
> (4) No limitation on existing enforcement authority.
> The administrative process provided in this section
> does not prohibit the Office of Housing, the DEC, or
> HUD generally, to take whatever action may be
> necessary when necessary (notwithstanding the
> commencement of this process), as authorized under
> existing statutes, regulations, contracts or other
> documents, to protect HUD's financial interests in
> multifamily properties and to protect the residents of
> these properties.

See 24 C.F.R. § 200.857(i); 65 Fed. Reg. 77244 (same).

34

The REAC Regulations do not prohibit HUD from finding a default of the HAP contract upon a failure to meet the REAC inspection standards and do not prohibit a default finding when an inspection score is under sixty points.

To the extent that Plaintiffs' argument that a default may be declared based on a "single inspection score" reargues their due process claims related to HUD's 2003 and 2004 inspections of their properties.  In the 2007 Order, the Court dismissed Plaintiffs' challenge to procedures used in connection to the 2003 and 2004 inspections.  See 2007 Order at 23.

### c.  Plaintiffs' Have Not Established that HUD Acted in Bad Faith

In arguing that the Court should not accord deference to HUD's regulations, Plaintiffs claim that HUD has acted in "bad faith."  See Pl. Mem. in Supp. at 15-22.  Plaintiffs contend that HUD's promulgation of the REAC Regulations was part of a scheme by HUD to terminate HAP contracts and replace them with tenant vouchers.  See Pl. Mem. in Supp. at 15.  In support of their claims, Plaintiffs point to comments from industry members, allegedly false pretenses for HUD's actions, differences between the REAC Regulations and the REAC Protocol,

35

and HUD's failures to comply with the RFA, UMRA, and Executive

Order 13132.  <u>See</u> Pl. Mem. in Supp. at 15-22.  However,

Plaintiffs' allegations do not substantiate their claim that HUD

acted in bad faith to destroy HAP contracts and are dismissed.


### d.  Plaintiffs' Disagreements with the REAC Protocol's Inspection Standards Do Not Render It Arbitrary and Capricious

Plaintiffs contend that the various weights that HUD

allegedly assigned to particular deficiencies in scoring

Plaintiffs' properties rendered the REAC inspection standards

arbitrary and capricious.  <u>See</u> Pl. Mem. in Supp. at 12-15.  To

take an example, Plaintiffs contend that HUD's alleged

deductions from their REAC scores for things like the condition

of the electrical panel in the elevator room, "minor" peeling

paint, damage to sinks, and cracks in the exterior mortar, are

"inane."  <u>See</u> Pl. Mem. in Supp. at 13.  Plaintiffs contend that

such things are unrelated to whether a property is in "decent,

safe, and sanitary" condition.


To the extent that Plaintiffs challenge the deductions

to the Plaintiffs' REAC scores in connection with the 2003 and

2004 inspections, <u>see generally</u> Affidavit of Jerome Z. Ginsberg

in Supp. at 12-17, the Court already dismissed Plaintiffs'

36

challenge to these inspections in the 2007 Order.  See 2007
Order at 23.


          Apart from that, Plaintiffs appear to be asking the
Court to do what the Supreme Court has directed courts not to do
- to "substitute its judgment for that of the agency." Citizens
to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416
(1971), overruled on other grounds by Califano v. Sanders, 430
U.S. 99, 105 (1977); accord LaFleur v. Whitman, 300 F.3d 256,
267 (2d Cir. 2002); City of New York v. Shalala, 34 F.3d 1161,
1167 (2d Cir. 1994).  While the ambiguity surrounding the
precise contents of the REAC Protocol prevents the Court from
precisely ascertaining the appropriate amount of deference to
give these agency pronouncements, the Court has determined that
even under Skidmore deference, the REAC Protocol as Plaintiffs
have defined it is entitled to deference.  Furthermore,
Plaintiffs have failed to establish that HUD's inspection
criteria are actually flawed.

**e.  The REAC Protocol Does Not Violate the Tenth Amendment**


          A violation of the Tenth Amendment is found where the
federal government commandeers state actors to enforce federal
policies.  See generally Connecticut v. Physicians Health Servs.

37

of Conn., Inc., 287 F.3d 110, 122 (2d Cir. 2002).  Plaintiffs

make no such allegation.  The Tenth Amendment is not violated

where, as here, HUD requires property owners voluntarily

participating in one of its programs to meet certain

requirements above and beyond local and state requirements.  See

Cellular Phone Taskforce v. Fed. Communications Comm'n, 205 F.3d

82, 96 (2d Cir. 2000) (holding that a federal telecommunications

law preempting states' ability to regulate the health and safety

issues with respect to certain personal wireless service

facilities does not violate the Tenth Amendment because the

"statute does not commandeer local authorities to administer a

federal program.").


## Conclusion


        Based on the conclusions set forth above, Plaintiffs'

motion for summary judgment is denied, and Defendants' motion

for judgment on the pleadings is granted.  Plaintiffs' complaint

is dismissed with prejudice.


        It is so ordered.

New York, NY
April 5, 2011

_____
            ROBERT W. SWEET
                U.S.D.J.

38